Becker v. The City of Evansville Mr. Burkhart May it please the court, Robert Burkhart on behalf of the appellant, Officer Zachary Effriech. This appeal is before the court on the magistrate judge's denial of qualified immunity on the excessive force claims. This court has never required an officer to sacrifice his safety when arresting a non-compliant violent felon who was unsearched and possibly armed. This court has recognized that when an officer's face was uncertain or threatening circumstances, he may err on the side of caution when it comes to his safety and the use of force. And that's exactly the circumstances which Officer Effriech faced in this case. He had an individual who was wanted for a crime involving a deadly weapon, who had a history of violent behavior with a deadly weapon, was unsearched and possibly armed, he had failed to come out, he was screaming on an elevated and confined space when confronted by Officer Effriech. Okay, I have a problem with a couple of those statements. Number one, possibly armed, we're talking three weeks after the incident that led to the arrest warrant. So I don't know that there's sufficient evidence to support any assumption on the officer's part that his arrest suspect was possibly armed. And you're talking about or suggesting that he was resisting arrest or refusing to come down the stairs, and there's no evidence to support that at all. Well, the first point is, it's easy for us who are in a safe, confined area to say that there's no threat, but you're talking about officers whose lives are on the line every day. Okay, I understand all of that as a general matter, and I'm with you on that. That's like mom and apple pie, okay? Let's talk about the real facts of this case. It were three weeks after the incident for which he was being arrested. If it were contemporaneous or a hot pursuit or within a couple of hours that they were seeking to arrest him, they reasonably ought to assume that he's still armed, but what three weeks later? Well, they're going to arrest somebody for a warrant for battery with a deadly weapon, and they know he has a prior charge of that as well. So they know going in, this is a violent person who has used deadly weapons in the past, so it's certainly reasonable for them to believe that he has access to or may even use deadly weapons. If he used a deadly weapon against his brother-in-law, then there's reasonable to believe that he could perhaps use it against an officer. So when they go in, they know those facts, and that's the basis upon which, in part, they use the canine. But the second part in terms of the timing, what we have is assuming his facts as alleged is that he had two minutes, at least two minutes from the time when his mother told him the police were there to arrest him, to put on a shirt and a pair of pants and walk a distance less than a first down. So two minutes in the scheme of a day doesn't sound like much, but when you're sitting there as a police officer knowing you've got a violent felon you have to arrest, and he's got to travel a distance from less than one end of your bench to the other, in two minutes, that's an extremely long period of time. Based upon their experience and their training, they know that the longer that person has who doesn't show up, there's potential problems. So that's why then they removed him, or removed the family, and then sent in the canine. Preliminary, though, as I understand it, there's no challenge to turning the dog loose in the first place. That's correct. The magistrate granted summary judgment on that issue. So what we're here on... That initiated all of this. That's correct. And they didn't keep him on a leash or something else. So that's not even a challenge here, so it comes down to the encounter. Right. And that's when he encountered him, he was on a landing, and you've got the pictures there. It's a small landing, an elevated landing, three steps up. When he confronts him, Officer Elfrick sees the dog, sees the plaintiff, who admittedly is screaming. He sees the presence of another female who he was not advised was in the house, who was also screaming. So you've got a tense, uncertain situation. Plaintiff admits that he was noncompliant when the officer told him to get on the ground. Well he's got the dog clamped onto his leg, and his hands on his head, and he's at the top of the stairs, right? That's right. He's in an elevated position where he's superior to where the officer is, and the officer has made a command to get on the floor. And the officer doesn't know whether he's surrendering or what he's doing, but he has the right in that circumstance to immediately get him to the floor, which is what he did. He pulled him down, put him on the floor, handcuffed him, removed the canine. Right. But his version, which we accept at this stage, is that he couldn't hear all these commands because everybody's screaming and the dog is clamped on his leg. And... So we have to accept that version of the facts. And the law doesn't... You know, he doesn't obviously have a weapon on him, so the officer can at least visually see that he's not armed with anything obvious now. Well, he used a knife on his brother-in-law. He has his hands up. It doesn't mean he can't have a knife in his back pocket, he can't have some other object to harm him. But more importantly, the law doesn't say that simply because one is noncompliant is because they're screaming and can't hear is justified. It's not. And so the officer's perspective is, he's not being compliant with my directive to get on the ground. And the officer in that circumstance has the right to effect that arrest by pulling him down, securing him with handcuffs, and then removing the canine. And that's exactly what he did. It was consistent with the training and experience that he had under those circumstances. I want to do that too. I heard something, saw something, I thought it was about three quarters of a minute or something. There's nothing in the record definitively which says how long, once he engaged him on the stairs until he removed the canine. There isn't? No. The only thing that actually worries me about this is the dog continues to terrorize, but while he's, not after he's pulled down. I tried to picture it. He's pulled him down, obviously he falls forward, he takes his hands off his head, I assume, puts them out in front, tries to catch himself. In the meantime, the dog has got a pretty strong grip on his calf. It was the ankle at the start, but I guess it's the calf. And then he does what he does. He puts the arms behind him and puts the cuffs on. In the meantime, the dog's still tearing his leg. That's, the question is, do they call the dog off sooner or does that matter because it's such a short period of time? One, I think, one, it's a short period of time, but two, he released the dog under the belief that it was for safety and control purposes, and that didn't end by the time he saw him. You're talking about when the dog. Right. When he didn't know where he was. Correct. But then when he sees him on the stairs, there's still a tense, uncertain situation, and so that's why he first has to secure the suspect, and he does that by pulling him down and putting the handcuffs on him and promptly removing him. There's no dispute that the canine was promptly removed after the handcuffs were placed on him. So it was a very short period of time, and it's true. I mean, it did cause some damage to him, but the use of the canine was for safety purposes and control. Permanent damage. Right? Please. He suffered permanent damage. He did. What is his record? What is his record? The plaintiff's record, criminal record. It's long and... What's the record of convictions? I don't know that the record... That was known to your client. They knew that he had been charged four months earlier for intimidation with a deadly weapon, and they also knew that... That was a pending charge, or it was just an arrest or a complaint? It was a pending charge in which he ultimately went to prison for both of these. He pled guilty and went to prison. Okay. So at the time of the arrest, it was a charge for what? I'm sorry. What was the fact pattern of that? The one was intimidation with a deadly weapon. He had chased his... He was drunk and stayed, chased his roommates out of the house and threatened them with a sword, and then the next one was he had put a knife to his brother-in-law's throat and threatened... Well, that's the present defense that he was being arrested for. Correct. The threat against the brother-in-law. Correct. Okay. But no record of convictions that we know of or that your client was aware of? No. Not prior. He was obviously convicted on this one, but he pled guilty to this one. So when you refer to the known violent felon, we're talking about these two charges? That's correct. Okay. Which are obviously... The whole reason police keep information is so they know when they go in whether they're And they knew this was exactly the kind of individual. And so the right to arrest carries with it the right to use a certain amount of force. We think in this case that force was reasonable under the dangerous circumstances. Mr. Burkhart, just so I'm clear, so your position is until the handcuffs are secured on the suspect, the dog need not be called off? That's correct, and that's consistent with the Johnson v. Scott case in this court where the same thing occurred. An individual had fled, supposedly surrendered at the end. The officers secured him first and then removed the canine. But he was fleeing in that case. The suspect was fleeing. That's correct. This was a hot pursuit in the immediate aftermath of the crime? That's correct. This, again, is very different. We're three weeks later, and there's no flight. There's no resisting arrest. There's noncompliance in one. He's not timely coming down. Even the girlfriend says he was... That's qualitatively different from flight in the immediate aftermath of... Not when you're a police officer on that ground floor wondering where he is. He's not coming down. His girlfriend even says he procrastinated because he didn't want to be arrested. So they know what's before them is the information that this individual is not coming down. I don't know what he's doing. Is he arming himself? Is he hiding? And that's the reason why they released the canine in the first place. Thank you, Mr. Burkhart. Mr. Whitehead. May it please the Court, Steve Whitehead on behalf of Jamie Becker. I honestly don't know what else Jamie Becker could have done to be more compliant than what he was doing. He could have gotten dressed faster. Possibly could have gotten dressed faster. I understand that. But at no time did he attempt to resist. At no time did he attempt to flee. He was certainly unarmed. Had the officer felt threatened from the time that he left, let Axel loose, I would surmise that he would be approaching Mr. Becker with his gun out and up if he were that concerned. Well, that was the purpose of the dog substituted for the gun, right? I mean, rather than go up the stairs himself, his gun drawn, prepared to use it, he sent the dog up. Right. I understand that. But by the same token, he's saying that he's potentially armed. His hands, the dog doesn't have a hold of his hands. I'm just saying that had that been truly a thought pattern that the officer, Alfred, was having at the time, that he would have gone in, gun out and up. Right. But as Judge Mannion pointed out, I guess we're not really here contesting the initial decision to release the dog. I agree. With the bite and hold command because there was no cross appeal on that aspect of the district court's decision. No cross appeal by you. So it's just the refusal to call off the dog, as I understand it, that we're here on. Well, and also his basically taking him and pulling him down three flights of steps, face first, while the dog is attached to his leg, putting his knee in his back, and then attempting to cuff him. Okay. And my client did nothing to resist any of that. He said, I call the dog off. I give up. I'm not doing anything. Yet, probably three minutes later, his left calf is removed from his leg. He's done nothing to resist. And I really don't know what else to say to you other than he was compliant. He was a compliant arrestee. And there should have been no force, from our perspective, utilized in making this arrest. But the force that was used was certainly excessive. We feel that Magistrate Hussman certainly got it right when he said that there was no basis for qualified immunity here. And we would ask the court to uphold his ruling and send it back to the trial court. I believe it. I don't remember where I read it. But it's somewhere that this dog was trained to bite the first person it encounters. Yes, this was a bite and hold training dog. But if the girl came down first, she would have been the one that got bit. Yes. But see, he didn't challenge the release of the dog. We did challenge it, but I think the summary judgment was granted as to that aspect. Qualified immunity was granted as to that aspect. So that was a given, the release of the dog. Because that's my main problem with this case. I don't know whether the officer could walk in with the dog on a leash where he's got control of him and let him go when he was threatened or letting the dog loose first eliminates the threat. Exactly. Other than waiting for the dog to be shot. And Magistrate Hussman found that he was constitutionally allowed to release the dog. But the other two acts of force that were used by the officer is what he had exception to and what he found the qualified immunity didn't apply to. Thank you. Thank you, Mr. Wright. Okay. Mr. Burkett, I have a question. I'm trying to visualize as best we can the circumstances, the stairs. And I also understand the position that for the dog to be called off prior to handcuffing would require a leashing of the dog. Why was the dog not on a leash in a house that had just gone up the stairs? Why isn't there a leash of 20 feet or whatever? What is the procedure if there is any in that regard? Because it seems to me that I understand if procedures call for handcuffing and then release. I mean, take the time to release the dog. Why is the dog unleashed in this kind of a setting? The evidence in the record is one that prior to releasing the dog, the officers confirmed that there was no one else in the house but Mr. Becker. And he indicated if he had known that the girlfriend was in the house, he would have never released the canine because the way the canine is trained, it engages the first person it sees. No, I appreciate that. But why in a house with, I don't know, the length of these stairs, but why is the dog not on a leash? Is there some fear that he's going to jerk the officer in some way? I mean, it just seems to me if we had a dog on a leash, this timing factor wouldn't be so critical. Well, there's nothing specific in the record on that other than Officer Elfrick's testimony that the training is to release the canine under these circumstances because, one, for safety purposes, that's the way the dog is trained to locate and to bite and hold until the officer can get there and secure the suspect. Sure. And he indicates that it's safer to allow the dog to be released as opposed to him going around a corner where someone could be sitting there with some kind of weapon or threat. And that's why the dog is released instead of trying to hold the dog back on a leash. Well, when they come in, when he appears, that is, Mr. Becker appears, he's at the top of the stairs, I guess. Well, the best I can describe it, you walk in the house, there's a front living room, that's where he released the canine. He goes down a hallway and then it takes a sharp right and there's a small landing of three steps and you've got a very small landing, maybe three by three with a door on it, that leads, kind of angles back up, steps going upstairs. And so when he turned the corner and saw Mr. Becker, Mr. Becker has his back to the wall, there's a wall to the side, there's the steps going up where the girlfriend is sitting there screaming, and you've got the dog kind of around the back side of him. So in order for him to go and release the dog, he would have had to try and squeeze between the girlfriend and Mr. Becker, reach down and get the dog, all while Mr. Becker has the opportunity to use his weapon, and that's the reason why he pulled him quickly, put the cuffs and released him. Are there any standards in place in the police department for when the decision is made to go to a scene with the bite and hold dog? In this case, yeah. I mean, the testimony was because he had had a history and because this charge was involving a deadly weapon. Well, I understand that's the reason why the decision was made. I'm talking about standards apart from this case. Who makes the decision? Is there a protocol? Is it reviewed by some higher up before they actually use this dog? I mean, this is a deadly weapon. Well, I wouldn't call it a deadly weapon. Potentially deadly weapon and one that can inflict great bodily harm. Great bodily harm. I don't think any court has ever said a canine is a deadly weapon, but sure, it can certainly be. Could be. A dog can kill somebody. Right. Gets out of control. In this case, the record has the standards for the canine. As I sit here, I can't tell you whether it talks about the prior review and actually using the canine to go to the scene, but that was just as Officer Hoffman testified. I mean, there must be some law enforcement standards that govern the use of these dogs. Well, certainly the EPD has their own standard, which is in the record, but in terms of why he went to the scene, he testified it was because part of the policy was if it's involving a high-risk deadly weapon, they use the canine if necessary, and that's why it was present and it was utilized, obviously, once the officers felt like he didn't come down. So based upon those, the force was reasonable. Thank you. The case is taken under advisement. Court will proceed to the hearing.